**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Latasha Hampton, | No. CV-24-00760-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| City of Tempe, et al., | |
| Defendants. | |

Plaintiff Latasha Hampton, a Tempe police officer, brings multiple claims against the City of Tempe and one claim against eleven employees of the Tempe Police Department ("TPD"). Hampton alleges racial discrimination based on various workplace incidents that culminated in her reassignment from patrol to civilian property disposition. Defendants move to dismiss all claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Most claims are dismissed with leave to amend, and all the individual defendants are dismissed.

## I.    Background

The relevant events in Hampton's complaint span from June 2020 to January 2023. Although she sues eleven members of the TPD whom she alleges were involved in the workplace incidents, the complaint mentions a few of them only in passing.[1] Hampton's claims appear to focus on TPD's treatment of her during a use-of-force investigation. Hampton believes that treatment was discriminatory and constituted part of a hostile work

---

[1] These defendants are ultimately dismissed along with the other individual defendants.

1    environment. She also claims these incidents resulted in retaliation against her for protected
2    conduct.

3    Hampton, a Black woman (Doc. 33-3 at 3), has been a TPD police officer for over
4    22 years. (Doc. 28 at 6.) In August 2021, she passed the sergeant exam and was placed on
5    the sergeant list. (Doc. 28 at 6.) Defendant Katrina McCann, a TPD lieutenant who was
6    seemingly involved in the testing, "began telling other TPD personnel that she believed
7    [Hampton] cheated because there was no way" she did well on the exam "on her own."
8    (Doc. 28 at 4, 6–7.) Assistant Chief Andre Anderson instructed Lieutenant McCann "to
9    cease her . . . disparaging comments" (Doc. 28 at 7), but the remarks had already created
10   "a tense and hostile environment" for Hampton "because some officers" believed them
11   (Doc. 28 at 7). Hampton does not allege any facts indicating this rumor was tied to her
12   race.

13   In September 2022, Hampton responded to a trespassing call where Officer
14   Rodriguez had the suspect at taser point. (Doc. 28 at 7.) The suspect was resisting arrest,
15   so Hampton used her taser eleven times for a total of 35 seconds. (Doc. 28 at 7.) The
16   struggle continued, and Officers Rodriguez and Kitchens "began delivering head strikes to
17   the suspect." (Doc. 28 at 8.) "Following the incident, Sergeant Lance Sewell completed the
18   Use of Force investigations . . . and was told by Defendant [John] Giltinan," a TPD
19   lieutenant, "to review the incident immediately and mark the force as unjustified." (Doc.
20   28 at 3, 8.) Allegedly in violation of TPD procedure, Sewell forwarded his review of the
21   use-of-force incident to Giltinan, "who immediately marked the force as unjustified and
22   forwarded the case to Internal Affairs [("IA")] for investigation." (Doc. 28 at 8–9.)
23   Hampton claims she later requested additional training regarding suspect control but that
24   request was denied because of the ongoing investigation. (Doc. 28 at 9.)

25   Hampton alleges Lieutenant Giltinan and defendant Dane Sorensen, a TPD
26   commander, violated TPD policy by "immediately submit[ing]" her use-of-force incident
27   to IA in September 2022 and by "never submit[ing] the incident to the Use of Force

28

Committee[2] for review." (Doc. 28 at 12.) Additionally, defendant Lieutenant Sean Still allegedly misled Chief of Police Jeffrey Glover "in an attempt to cover his mistake for not following [TPD] procedure." (Doc. 28 at 3, 12.) Based on this misinformation, Glover sent the investigation to the Mesa Police Department ("MPD"). (Doc. 28 at 12.) But "MPD made no findings and no conclusion that [Hampton's] Use of Force Incident rose to the level of an IA investigation, [and] TPD proceeded to adjudicate the investigation themselves." (Doc. 28 at 14.) Under TPD policy, investigations must be completed within 180 days. (Doc. 28 at 14.)  The deadline to complete Hampton's was March 9, 2023, but the investigation extended beyond that date without proper authorization. (Doc. 28 at 14–15.) The failure to complete the investigation on time led to its eventual dismissal in March 2023. (Doc. 28 at 15–16.) No disciplinary action was taken against those responsible for the investigation's delay. (Doc. 28 at 15–16.)

In April 2023, Assistant Chief Masters told Giltinan and other officers who "repeatedly called the investigation 'the Hampton Investigation' . . . to refer to the investigation as the 'Carl's Junior Investigation' as it involved more officers than just [Hampton]." (Doc. 28 at 16.) Giltinan expressed frustration about the investigation, claiming it was ended because Hampton was involved and she receives special treatment. (Doc. 28 at 16.) Masters reiterated the investigation ended solely because "it went past the 180-day investigation period requirement." (Doc. 28 at 16.) Masters was then terminated by defendant Andrew Ching, the former City Manager. (Doc. 28 at 16.) Soon thereafter, Assistant Chief Anderson—who allegedly advocated for and defended Hampton—was reassigned and Hampton "felt that the only two protections [she had] against the discriminatory behavior and retaliation [she experienced] at TPD had been eradicated, creating an even more hostile work environment." (Doc. 28 at 18–19.)

Soon thereafter, an anonymous letter was sent to the Arizona Peace Officer Standards and Training Board ("AZ POST") alleging favoritism in Hampton's case. (Doc. 28 at 16.) Allegedly on the same day, crucial evidence from Hampton's taser logs—"which

---

[2] This committee is not explained in the complaint.

contained evidence that would confirm" her version of events—was deleted. (Doc. 28 at 17.) During a closed-door meeting soon after the anonymous letter was sent to AZ POST, Commander Sorensen intimidated Hampton. (Doc. 28 at 17–18.) Hampton alleges this was one of numerous occasions when Sorensen talked down to her, belittled her, and disrespected her, but she does not describe the other occasions. (Doc. 28 at 17.) This meeting "and the totality of the investigation . . . further created a hostile environment for [Hampton] that caused her to not feel safe at work at TPD." (Doc. 28 at 18.) No factual allegations link these events to Hampton's race.

In July 2023, Hampton met with defendant Kenneth McCoy, the TPD Police Chief, who asked her "how she felt about the culture in TPD." (Doc. 28 at 20.) Hampton "advised him that TPD had an unhealthy and negative culture where people were treated unfairly if they spoke out against unfairness, that investigations and discipline were not held in a fair and equitable manner, and often hostile and unlawful behavior of senior staff were overlooked." (Doc. 28 at 20–21.) Around the same time, Hampton was informed she had to undergo additional training related to the use-of-force incident. (Doc. 28 at 21.) Hampton asked to see the Force Review Committee's[3] recommendations, but she never received them. (Doc. 28 at 21.)

On July 19, 2023, Hampton filed "a complaint of the hostile work environment and discrimination that she faced at TPD with the City of Tempe Diversity Office." (Doc. 28 at 22.) She provided defendant Velicia McMillan Humes, the Chief Diversity Officer for the City, a timeline of events regarding the discrimination and hostile work environment. (Doc. 28 at 22.) Humes said she would provide Chief McCoy with the timeline and set up a time when Hampton could meet with Chief McCoy to discuss the events, but no meeting was ever set because Chief McCoy declined to meet with Hampton. (Doc. 28 at 22.) No further action was taken and no investigation was ever launched regarding Hampton's allegations. (Doc. 28 at 22.)

In August 2023, Hampton's use-of-force incident was presented to the AZ POST

---

[3] This committee is not explained in the complaint.

- 4 -

board. (Doc. 28 at 22.) At that hearing, a compliance specialist recommended the board move forward with disciplinary actions against Hampton, Rodriguez, and Kitchen based on their actions during the Carl's Junior Incident. The board only moved forward with disciplinary actions against Hampton, not Rodriguez or Kitchen. (Doc. 28 at 22–23.) After the hearing, Hampton received an email from Chief McCoy advising her "that she would be reassigned to a civilian property disposition until further notice and was removed from the patrol area to a different building." (Doc. 28 at 23.) Hampton alleges this reassignment was outside normal disciplinary procedures, was retaliatory in nature, and further ostracized her from other TPD personnel. (Doc. 28 at 23–24.) This reassignment seemingly occurred about a month after Hampton submitted her complaint to Humes. Hampton expressed her concerns to McCoy about the actions taken against her, and shortly thereafter was allowed to return to her original office "to do the same job she was relocated to do demonstrating that the relocation was never necessary and [was] an act of retaliation." (Doc. 28 at 24.)

Hampton alleges her treatment in connection with the Carl's Junior Incident was markedly different than that of two white officers who had similar use-of-force incidents. First, in June 2020, Hampton arrived on a crime scene and observed a victim who had been handcuffed "simply because [he] did not want to speak" to the officers involved. (Doc. 28 at 10.) Hampton had Officer Larson, a white male, remove the handcuffs and release the victim, a Black male. (Doc. 28 at 10.) She contacted Sergeant Kayla Forsen to file a complaint against Officer Larson, but Sergeant Forsen disregarded the complaint. (Doc. 28 at 10.) Hampton then filed an internal complaint with TPD's diversity office. (Doc. 28 at 10.) IA investigated the case but did not sustain the charge against Officer Larson. (Doc. 28 at 10.)

Second, in January 2023, Hampton "responded as a supervisor to a trespassing call where Officer Regester, a white male, used his taser on the suspect, a black male." (Doc. 28 at 10.) After investigating, she "determined the use-of-force [by Officer Regester] to be out of policy." (Doc. 28 at 11.) Hampton talked to Giltinan about the situation, but Giltinan

believed Officer Regester's use of force fell within TPD policy and found it "justified." (Doc. 28 at 11.) Hampton disagreed and indicated on a form that the use-of-force was unjustified. (Doc. 28 at 11.) The form was forwarded to Officer Regester's supervisor but "[n]o further investigation, disciplinary action, or additional training was given." (Doc. 28 at 11.)

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted)). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[D]etermining whether a complaint states a plausible claim is context specific, requiring the reviewing court to draw on its experience and common sense." *Id.* at 663–64.

## III.   Analysis

Hampton's claims against the City are for disparate treatment under Title VII, hostile work environment under Title VII and the Arizona Civil Rights Act ("ACRA"), retaliation under Title VII and the ACRA, and breach of implied contract. Hampton also alleges spoliation of evidence against all the individual defendants. Defendants move to dismiss all counts for failure to state a claim.[4] All but Hampton's retaliation claim are dismissed, most with leave to amend.

### A.  Title VII Discrimination

Statutory discrimination claims are often analyzed using a multi-step framework

---

[4] The City also moves to dismiss Hampton's request for punitive damages. (Doc. 33 at 16.) Fed. R. Civ. P. 54(c) indicates "dismissing" punitive damages would have no practical impact on this case. *See Cancellier v. Federated Dep't Stores*, 672 F.2d 1312, 1318–19 (9th Cir. 1982) (noting a "specific prayer for . . . punitive damages is [not] needed[]" to recover them). The court therefore declines to do so.

that requires a plaintiff to first make a prima facie showing of certain facts before the burden shifts to the defendant to make different showings. But the requirement of establishing a prima facie case is an "evidentiary standard" and not a "pleading requirement[]." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002). Thus, a complaint cannot be dismissed merely because it does not contain facts establishing all the requirements of a prima facie case. *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1137 (9th Cir. 2019). That said, a plaintiff's complaint must still include "sufficient, nonconclusory allegations plausibly linking the [adverse] action to discrimination" or retaliation. *Id.* at 1138 (applying this standard in the Title IX context). And it is still helpful to consider the elements of a prima facie case when assessing the plausibility of a complaint. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (holding a plaintiff is not required to "establish a prima facie case in her complaint" but "the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim"). Hampton does not plausibly allege her discrimination claim.

Title VII forbids discrimination by employers "because of" an individual's race, color, religion, sex, or national origin.[5] 42 U.S.C. § 2000e-2(a)(1). To establish a prima facie disparate treatment case under Title VII, a plaintiff must offer proof that: (1) she belongs to a class of persons protected by Title VII; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) her employer treated her differently than a similarly-situated employee who does not belong to her same protected class. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The City contends Hampton has not plausibly alleged the third and fourth factors.

Hampton's central allegation for her disparate treatment claim is that she was treated differently in connection with the Carl's Junior Investigation which began in September 2022. She makes this argument by alleging discrepancies in the investigation and by comparing her investigation to that of white officers who also had use-of-force incidents.

The City contends some of Hampton's allegations related to this claim are time-

---

[5] Hampton never states on what basis she believes she was discriminated against, but the court assumes based on context clues that she is asserting racial discrimination.

barred. Hampton had 300 days after an alleged unlawful employment practice to file her charge of discrimination with the Arizona Attorney General's Office to later pursue her claim in this court. *See E.E.O.C. v. Dinuba Med. Clinic*, 222 F.3d 580, 585 (9th Cir. 2000). She filed her charge of discrimination on November 29, 2023 (Doc. 33-3 at 3), meaning any allegations of discrimination or retaliation predating February 2, 2023, are time-barred because they are outside the statutory period.

Hampton alleges three things qualify as "adverse employment actions": (1) Lieutenant McCann spread a rumor that she cheated on her sergeant exam; (2) she was denied suspect control training while the Carl's Junior Investigation was pending; and (3) she was reassigned to civilian property disposition after the AZ POST decided to pursue discipline against her. (Doc. 34 at 4.) The complaint indicates the rumor was spread around August 2021 (Doc. 28 at 6–7) and the additional training was denied in September 2022 (Doc. 28 at 9). Neither of these instances can therefore be the employment practice undergirding Hampton's Title VII discrimination claim.[6] *See id.* But her reassignment to a "civilian property position" occurred after August 2023, so it may qualify as an adverse employment action.

The City acknowledges "reassignment in some instances may be an adverse employment action[ ]" but contends Hampton did not allege "that other *similarly situated* non-Black officers were treated differently." (Doc. 33 at 7.) Although Hampton alleges similarly-situated non-Black officers were treated differently (Doc. 34 at 5–6), the focus of her allegation is comparators who committed use-of-force violations but were not investigated. But because Hampton's claim hinges on her reassignment after the AZ POST decided to pursue discipline against her, she needed to point to comparators who were investigated and disciplined but not reassigned. *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (noting the plaintiff had not alleged there were other similarly situated individuals because his comparators had not

---

[6] The court nevertheless considers these incidents as background information. *See Lyons v. England*, 307 F.3d 1092, 1110 (9th Cir. 2002) (untimely evidence of the employer's discriminatory acts "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue.") (simplified).

engaged in "problematic conduct of comparable seriousness"). Hampton does not allege there were any other officers who were investigated for use-of-force, disciplined, and subsequently not reassigned or relocated. And she does not respond to the City's argument that she did not do so in her opposition, thus conceding the issue. *See Ramirez v. Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197, 1210 & n.7 (N.D. Cal. 2013) (collecting cases holding that failure to respond to an argument in an opposition brief may constitute a concession of the argument). For these reasons, Hampton fails to plausibly plead a Title VII disparate treatment claim and it is dismissed with leave to amend.

### B. Title VII Hostile Work Environment[7]

At the motion to dismiss stage, Hampton "need not support [her] allegations with evidence, but [her] complaint must establish sufficient facts to state the elements of a hostile work environment claim." *Johnson v. Riverside Healthcare Sys.*, LP, 534 F.3d 1116, 1122 (9th Cir. 2008). Hampton "does not have to prove a prima facie hostile work environment case at the pleading stage." *Arizona ex rel. Goddard v. Geo Grp., Inc.*, No. CV 10-1995-PHX-SRB, 2011 WL 13137316, at *8 (D. Ariz. Apr. 11, 2011). But for this claim too, it is helpful to consider the elements of a prima facie case when assessing the plausibility of a complaint. *See Khalik*, 671 F.3d at 1192.

The elements of a prima facie hostile work environment claim under Title VII are that the plaintiff "(1) [ ] was subjected to verbal or physical conduct because of her race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (simplified). "Courts are to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Kortan v. California*

---

[7] Hampton also asserts a hostile work environment claim under the ACRA. (Doc. 28 at 26.) The ACRA and Title VII are "generally identical," so the Title VII analysis applies to the ACRA. *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004).

*Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (simplified).

Hampton alleges the hostile work environment began around August 2022, escalated after her use-of-force incident, and persisted until her reassignment in August 2023. (Doc. 28 at 5–24.) She cites four events over nearly two years supporting her claim: (1) Lieutenant McCann's accusation that she cheated on her sergeant exam; (2) references to her use-of-force investigation as the "Hampton Investigation"; (3) interactions with Commander Sorensen; and (4) an anonymous letter that was sent to the AZ POST "complaining of internal injustices occurring with TPD regarding employee discipline and special treatment of certain officers" which mentioned her use-of-force incident.[8] (Docs. 28 at 5–24, 34 at 7.) Although she invokes the continuing violations doctrine to link these events, they do not appear sufficiently related to make that argument. *See Leland v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1092 (N.D. Cal. 2008) (noting the doctrine allows a court to "consider the entire scope of unlawful behavior . . . *provided that* all acts which constitute the claim are *part of the same* unlawful employment practice) (emphases added). And Hampton does not tie any of these events to her race.

Hampton has failed to plausibly plead race was a motivating factor behind the conduct she alleges. *Walsh v. J.B. Hunt Transp. Inc.*, No. CV-22-01123-PHX-SPL, 2023 WL 1800962, at *7 (D. Ariz. Feb. 7, 2023) (dismissing a Title VII hostile work environment claim because the plaintiff "failed to plead facts that, taken as true, would be sufficient to state a claim for hostile work environment because Plaintiff has not offered any factual allegation that race was the motivating factor behind the conduct Plaintiff alleges."). Because Hampton has failed to allege a hostile work environment under Title VII and therefore also the ACRA, her claims are dismissed with leave to amend.

### C. Title VII Retaliation

Hampton asserts a retaliation claim under Title VII and the ACRA. (Doc. 28 at 27–30.) She need not plead a prima facie retaliation claim "as long as it contains a short and

---

[8] Hampton alleges McCann spread the rumor about her cheating on the sergeant exam in August 2021, that Giltinan and others referred to the use-of-force incident as the "Hampton Investigation" around September 2022, and that she had hostile interactions with Sorensen in April 2023. (Doc. 34 at 7–8.)

plain statement of the claim showing that [she] is entitled to relief." *Equal Emp. Opportunity Comm'n v. Tesla, Inc.*, 727 F. Supp. 3d 875, 893 (N.D. Cal. 2024) (simplified). But the court can still look to the elements of a prima facie case to decide whether Hampton's complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Id.* In order to prevail on a retaliation claim, a plaintiff must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there is a causal link between the protected activity and the adverse employment action. *Vasquez*, 349 F.3d at 646. An adverse action for a retaliation claim is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations and citations omitted).

Hampton has plausibly pleaded her retaliation claim. Around July 19, 2023, she filed a complaint with Humes in the City of Tempe Diversity Office alleging a hostile work environment and discrimination. (Doc. 28 at 22.) She provided Humes "with a timeline of events regarding the discrimination and hostile work environment at TPD." (Doc. 28 at 22.) Humes said she would send the timeline to McCoy and set up a time for him and Hampton to meet, but no meeting was ever set because "McCoy declined to meet" with her. (Doc. 28 at 22.) About a month later, her use-of-force incident was presented to the AZ POST board. (Doc. 28 at 22.) A compliance specialist presented the case and recommended the board move forward with disciplinary action against officers Hampton, Rodriguez, and Kitchen. (Doc. 28 at 22–23.) The board unanimously decided to move forward with disciplinary action only against Hampton. (Doc. 28 at 23.) Soon thereafter, Hampton was told by Chief McCoy that she would be reassigned to civilian property disposition and moved to a different building. (Doc. 28 at 23.)

Hampton has plausibly alleged "McCoy's actions were retaliatory" (Doc. 28 at 23) and that her relocation was "a direct result of, and shares a causal relationship to, [her] complaints." (Doc. 28 at 30.) The proximity in time between her diversity office complaint, her relocation, and her reassignment, when considered alongside McCoy's knowledge of

her complaint and refusal to meet with her, plausibly suggests these actions were retaliatory. (Doc. 34 at 11.) *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 869 (9th Cir. 2014) (holding causation in a retaliation claim can be inferred from the "proximity in time between the protected action and the allegedly retaliatory" conduct) (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)). The City argues Hampton was not reassigned or relocated because of her complaint and instead because of the AZ POST finding (Doc. 33 at 12–13), but the court need not resolve at this stage which was McCoy's true reason for reassigning and relocating her. Rather, it is enough at the motion-to-dismiss stage that Hampton has plausibly pleaded McCoy's reason for acting was retaliatory. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."); *see also Iqbal*, 556 U.S. at 678 (2009). The City's motion to dismiss Hampton's Title VII and ACRA retaliation claims is therefore denied.

### D. Spoliation of Evidence

Hampton asserts a spoliation of evidence claim under A.R.S. § 13-2809, alleging defendants deleted evidence that "would be vital" in the AZ POST investigation into the use-of-force incident: the taser logs from her use-of-force incident. (Doc. 28 at 31.) Defendants argue this claim should be dismissed for failing to comply with Arizona's notice of claim statute. (Doc. 33 at 13.) The court need not analyze the issue because the criminal statute does not create a private right of action and the Arizona Supreme Court has determined no such tort claim exists. *See Lips v. Scottsdale Healthcare Corp.*, 229 P.3d 1008, 1009 (Ariz. 2010) (noting Arizona does not have a distinct cause of action for first-party spoliation of evidence). The claim is dismissed without leave to amend and the individual defendants are dismissed.

### E. Breach of Implied Contract of Employment

Hampton alleges the City breached an implied contract of employment that was "established, modified, and enforced by . . . [its] Personnel Rules and Memorandums of

Understanding (MOU's)." (Doc. 28 at 32.) The City alleges the Arizona Employment Protection Act ("AEPA"), A.R.S. § 23-1501, "abrogated most common law claims for breach of 'implied' employment contracts in Arizona." (Doc. 33 at 14.) Indeed, the AEPA "specifically curtails most causes of action for termination of employment." *Johnson v. Hisp. Broadcasters of Tucson, Inc.*, 2 P.3d 687, 689 (Ariz. Ct. App. 2000). The statute changed the "inquiry from whether the employment agreement is enforceable at common law to whether the employment agreement satisfies the [AEPA's] requirements." *Id.* Although the court is skeptical, the parties apparently agree this statute applies to all aspects of employment policies, manuals, and procedures. *Cf. Roberson v. Wal-Mart Stores, Inc.*, 44 P.3d 164, 172 (Ariz. Ct. App. 2002) (not applying the AEPA in the context of policies expressed in an employment manual and whether it constituted an implied contract).

Hampton is not alleging a cause of action for termination of employment but rather for breaches of "implied promises and terms reflected in the" personnel rules and MOU. (Doc. 34 at 16.) Both parties agree the AEPA is the controlling law for this claim and the City does not contend the sort of implied contract Hampton alleges is not actionable under that statute. (*See* Doc. 33 at 14–16.) *See Leikvold v. Valley View Cmty. Hosp.*, 688 P.2d 170, 173 (Ariz. 1984) ("personnel manuals can become part of employment contracts"). The AEPA permits an actionable implied contract to "be set forth in the employment handbook or manual or any similar document distributed to the employee," but only if "that document expresses the intent that it is a contract of employment[.]" A.R.S. § 23-1501(A)(2).

Hampton does not contend that the personnel rules or MOUs expressed an intent to constitute a contract and she alleges no facts that would support such an argument. (*See* Doc. 34 at 15–18.) This failure to establish that the personnel rules or MOUs "expresse[d] the intent that [they are a] contract of employment[ ]" dooms her implied contract claim. § 23-1501(2). *See Taylor v. Graham Cnty. Chamber of Com.*, 33 P.3d 518, 528 (Ariz. Ct. App. 2001) (noting, in a failed implied contract claim, that "most importantly, [plaintiff] failed to establish that the personnel manual 'expresse[d] the intent that it is a contract of

employment.'") (citing § 23-1501(2)). Hampton cites *Wagenseller v. Scottsdale Memorial Hosp.*, 710 P.2d 1025 (Ariz. 1985), as allowing an implied contract claim "even if [the documents at issue] do not explicitly state they are contracts." (Doc. 34 at 17.) But *Wagenseller* was superseded in relevant part by the AEPA. *See Fallar v. Compuware Corp.*, 202 F. Supp. 2d 1067, 1076 (D. Ariz. 2002).

Because Hampton has not sufficiently alleged an implied contract, her breach of contract claim fails. As a result, the court need not reach the City's argument that the claim is barred by the statute of limitations.

## IV.    Conclusion

Hampton's claims against the City for discrimination under Title VII, hostile work environment under Title VII and the ACRA, and breach of implied contract are dismissed with leave to amend. Her spoliation of evidence claim against all individual defendants is dismissed without leave to amend, and all individual defendants are dismissed. Hampton's retaliation claim under Title VII and the ACRA may proceed.

Accordingly,

**IT IS ORDERED** granting in part defendants' motion to dismiss (Doc. 33).

**IT IS FURTHER ORDERED** no later than **March 28, 2025**, plaintiff may either file an amended complaint or a statement indicating she does not plan to amend. If plaintiff amends, defendant City of Tempe shall respond to that complaint within fourteen days of the amended complaint being filed. If plaintiff does not plan to amend, defendant City of Tempe shall file its answer to the retaliation claim no later than **April 4, 2025**.

Dated this 14th day of March, 2025.

Honorable Krissa M. Lanham
United States District Judge