**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Latasha Hampton,

Plaintiff,

v.

City of Tempe,

Defendant.

No. CV-24-00760-PHX-KML

**ORDER**

Plaintiff Latasha Hampton, a former Tempe police officer, brings claims for Title VII disparate treatment and Title VII and Arizona Civil Rights Act ("ACRA") retaliation against the City of Tempe. These claims stem from various workplace incidents that culminated in the City temporarily reassigning Hampton to a different job, placing her on administrative leave, and confiscating her City-issued equipment. The City moves for summary judgment on all claims. Its motion is granted.

## I. Background

### A. Reassignment to Property Disposition

As of 2022, Hampton, a Black woman, was a Tempe Police Department ("TPD") sergeant. (Doc. 85 at 2, 12.) In September 2022, Hampton and two other officers responded to a trespassing call at a Carl's Jr. (Doc. 83 at 2.) TPD investigated all three officers for potentially unjustified use-of-force at that incident, but the investigation ran longer than authorized by state law so no disciplinary actions were taken. (Doc. 83 at 2–3.) The Arizona Peace Officer Standards and Training Board ("AZ POST") at one point received an

anonymous letter alleging misconduct and favoritism by the TPD, highlighting the lack of discipline for Hampton's actions at the Carl's Jr. and accusing the TPD of considering race in making disciplinary decisions. (Doc. 85-1 at 9–10.)

Driven in part by her experience during and after the investigation, Hampton filed a "Safe Haven" complaint in July 2023. (Docs. 83 at 4; 85 at 3.) "Safe Haven" is a City procedure allowing employees to report workplace concerns to individuals outside their chain of command. (Doc. 83 at 4.) Hampton met with Dr. Velicia McMillan Humes, the City's Chief Diversity Officer, and complained of racial bias and retaliation in how the TPD handled the Carl's Jr. use-of-force incident. (Docs. 83 at 4; 85 at 3.) Hampton gave Dr. Humes permission to relay her concerns to TPD Police Chief Kenneth McCoy and asked if she could meet with him. (Docs. 83 at 4; 85 at 3.) But when Dr. Humes reached out to McCoy to inform him of Hampton's complaint, McCoy declined to meet with Hampton. (Docs. 83 at 4; 85 at 3.)

About a month later, in August 2023, AZ POST initiated an investigation against Hampton over the Carl's Jr. incident. (Docs. 83 at 4; 85 at 3.) McCoy emailed Hampton that same day that he was temporarily reassigning her to "Investigations, working on property disposition." (Doc. 85-2 at 118.) McCoy stated the transfer was "not disciplinary in nature, nor is it a reflection of your skills or dedication as an officer, but rather a necessary measure pending the outcome of the AZ POST proceedings." (Doc. 85-2 at 118.) At the time of this reassignment, Hampton had been restricted to office-only light duty due to an injury to her hand. (Doc. 85 at 3–4.) Hampton was stripped of supervision of her squad and forced to move offices as a result of her reassignment to the property disposition job. (Doc. 85 at 3–4.) When she moved offices, another sergeant took her original office space. (Doc. 83 at 6.)

Hampton alleges this reassignment was the result of race and gender discrimination and was retaliatory in nature. As evidence, she points to another similarly-situated officer, Ronald Kerzaya—a white man. (Doc. 85 at 10–11.) Kerzaya had three use-of-force incidents: (1) he tased a Black man who was holding a child, but was not disciplined (Doc.

40 at 20–21); (2) he was investigated for a use-of-force incident, resulting in a two-week suspension and a "restrict[ion] to office duties within the patrol office for a year" (Doc. 40 at 19–20); and (3) he held a hotel employee at gunpoint and was suspended 80 hours for the incident (Doc. 40 at 20–21). Hampton claims Kerzaya is an appropriate comparator because he was not reassigned or relocated for any of these incidents like she was as a result of AZ POST's investigation. (Doc. 85 at 10–11.)

**B. Administrative Leave and Equipment Seizure**

Hampton filed an EEOC charge a few months after her reassignment, complaining that it resulted from gender and race discrimination and retaliation. (Doc. 83-1 at 120–21.) She received a right-to-sue letter for that charge in January 2024 (Doc. 40 at 5) and filed this lawsuit on April 4, 2024 (Doc. 1).

Around the same time, between April 2 and April 4, the TPD Professional Standards Unit conducted an audit of records related to the Carl's Jr. incident at Hampton's own request. (Doc. 85-1 at 129.) The audit revealed Hampton's login had accessed TPD's digital records years earlier and altered taser evidence in a way that caused the evidence to delete itself after about six months. (Doc. 85-1 at 130.)

On April 8, 2024, the City put Hampton on paid administrative leave pending further investigation into whether she deleted the digital taser logs. (Doc. 83 at 7.) She was escorted from her office and the City took her badge, firearm, taser, laptop, office ID, and phone. (Doc. 85 at 4.). The City issued Hampton a replacement phone the next day. (Doc. 83 at 7.) Hampton later filed a second EEOC charge alleging gender discrimination and retaliation associated with her placement on leave and the seizure of City equipment. (Doc. 83-2 at 2–4.) That EEOC charge did not mention race. She obtained a right-to-sue letter in April 2026. (Doc. 85-1 at 1–2.)

Hampton alleges in the Third Amended Complaint ("TAC") that her placement on leave and the seizure of her equipment were racially discriminatory and retaliatory in nature. (Doc. 40 at 27.) Her summary-judgment response now argues that the discrimination was based on gender. (*See* Doc. 85 at 7, 13.) Regardless, she alleges the

City did not confiscate the equipment of other similarly-situated officers who were placed on administrative leave. (Doc. 40 at 27.) As examples, Hampton points to other officers Mezenghie, Shipley, and Hyde, whom she alleges were put on leave without having the same equipment seized from them. (Docs. 40 at 27, 29–30; 83-1 at 41–44.)

## II. Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of presenting the basis for the motion and identifying evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in h[er] favor." *Id.* at 255. But a non-movant cannot rest on mere allegations or denials and must instead show there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). "In the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action" because of the plaintiff's protected characteristic or action. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

## III. **Analysis**

### A. Title VII Disparate-Treatment Claim

Plaintiffs bringing disparate-treatment claims must establish a prima facie case of discrimination either through "direct or circumstantial evidence of discriminatory intent"

or by using the *McDonnell Douglas* framework. *Freyd v. Univ. of Ore.*, 990 F.3d 1211, 1228–29 (9th Cir. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)); *see Gleason v. Filter Holdings, LLC*, 737 F. Supp. 3d 1033, 1066 (D. Or. 2024). The *McDonnell Douglas* framework asks the plaintiff to first show "(1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated" individuals who were not part of the plaintiff's protected class "were treated more favorably." *Lui v. DeJoy*, 129 F.4th 770, 777 (9th Cir. 2025) (simplified). The evidence required for a prima facie case is "minimal." *White v. AKDHC, LLC*, 664 F. Supp. 2d 1054, 1067 (D. Ariz. 2009).

If the plaintiff establishes a prima facie case, the defendant must respond with "a legitimate, nondiscriminatory reason for the challenged actions." *Freyd*, 990 F.3d at 1228. Then, the burden falls back to the plaintiff to "show that the proffered nondiscriminatory reason is pretextual." *Id.* The plaintiff may demonstrate pretext with direct evidence that discrimination "more likely motivated the employer," or with indirect evidence, like something "showing that the employer's explanation is unworthy of credence." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). Demonstrating pretext is harder than making a prima facie case, requiring more "specific, substantial evidence." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010) (quoting *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)).

**1. Job Reassignment**

Hampton's disparate-treatment claim based on her reassignment to property disposition fails because even if she could make the "minimal" showing for a prima facie case, she cannot demonstrate that the City's non-discriminatory rationale was pretextual. *White*, 664 F. Supp. 2d at 1067.

The City's non-discriminatory reason for reassigning Hampton was its need "to limit its potential liability for any future actions by Hampton . . . by removing her from a public-facing, law enforcement position" pending AZ POST's decision to suspend or revoke Hampton's certification. (Doc. 83 at 11–12.) As proof, the City cites McCoy's email

to Hampton reassigning her, which he sent just hours after AZ POST started its investigation into Hampton. (Docs. 83-1 at 56–57; 83-2 at 21.) The City provides evidence it chose a non-public-facing property disposition job for Hampton because the City "had a need," and it moved Hampton's office to the property disposition room so another sergeant could use her office space while she was reassigned. (Doc. 83 at 13 (citing Doc. 83-1 at 4, 7–8, 14–18, 21, 58; 118).) Hampton fails to produce sufficient evidence to create a dispute of fact whether this explanation was pretextual.

First, Hampton contends the City did not need to move her to a non-law enforcement job. When AZ POST initiated its investigation, she was already on "light duty" and therefore had "no public-facing law enforcement duties." (Doc. 85 at 5 (citing Doc. 85-2 9–10).) But even on light duty, the City claims Hampton was still "in a law enforcement position" with supervision over a squad of officers who were themselves doing law enforcement work. (Doc. 87 at 7.) Hampton apparently agrees: her response describes the reassignment as an adverse employment action because she "was taken off sworn law enforcement work" and "lost supervision of her squad" (Doc. 85 at 10), and her deposition testimony suggests she was still "looking at [her] officers" before the move—in other words, supervising their law enforcement activity (Doc. 83-1 at 11). Because Hampton was still in a law enforcement position, her attack on the City's justification for reassignment—that it was necessary to remove her from law enforcement duties pending the AZ Post investigation—misses the mark.

Next, Hampton claims McCoy's email and the City's litigation declarations give shifting justifications for reassigning her, evidencing pretext. (Doc. 85 at 11 (citing *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993)).) But McCoy's email and the cited declaration—also McCoy's—both explain that reassignment was necessary pending the outcome of the AZ POST investigation. (Docs. 83-1 at 57–58; 85-2 at 118.) No justifications shifted.

Hampton also argues the City's explanation was pretextual because it treated Kerzaya, an allegedly similarly-situated white male officer, better. (Doc. 85 at 11.) But

Kerzaya was not similarly situated in "all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006); *Hawn*, 615 F.3d at 1158 (placing greater burden on plaintiff to show comparators were "similarly situated" at pretext stage than at prima facie stage). Kerzaya was not a sergeant and, in general, supervisors are not similarly situated to non-supervisors. *See White*, 664 F. Supp. 2d at 1068. In addition, Kerzaya was already in a non-law enforcement position when AZ POST initiated proceedings against him. (Doc. 83 at 10–11 (citing Doc. 83-2 at 7, 18).) The City therefore had no need to eliminate his law-enforcement duties via reassignment. Hampton offers no substantive response to the City's argument and evidence, simply citing the reassignment email McCoy sent her and parts of deposition testimony from TPD Assistant Chief Dane Sorensen that do not speak to Kerzaya's duties when AZ POST initiated proceedings against him. (Doc. 85 at 11 (citing Doc. 85-2 at 47–48, 118).) Hampton's singular focus on how *public-facing* Kerzaya's duties were lacks factual support in the deposition testimony she cites and in any event misses the point (Doc. 85 at 10–11); what matters was his lack of *law-enforcement* duties before being investigated.

She next contends that her reassignment lacked "individualized assessment" because it came 28 days after McCoy learned about her complaint of racial bias and within four hours of the AZ POST vote. (Doc. 85 at 11–12.) It is not clear what point Hampton intends to make of these undisputed facts. To the extent she protests her reassignment despite no individualized use-of-force analysis or explicit directive from AZ POST to reassign her, those facts remain consistent with the City's non-discriminatory rationale for reassigning officers upon being investigated by AZ POST. Alternatively, if Hampton takes issue with the timing of her reassignment following her complaint of racial bias, that level of temporal proximity—28 days—could not alone convince a reasonable jury that the City's explanation was pretextual. *Kama v. Mayorkas*, 107 F.4th 1054, 1061 (9th Cir. 2024). If anything, the fact that Hampton's reassignment occurred "the same afternoon" AZ POST initiated proceedings cuts against her because it affirms the City's legitimate explanation (Doc. 85 at 3). *Id.* at 1061.

Finally, Hampton includes a throwaway mention of the anonymous letter that led AZ POST to investigate her, suggesting the letter "came from within" the TPD and singled out Hampton for her race and gender. (Doc. 85 at 12.) But she cites nothing to support her claim that the letter came from inside the department. Even if it had, Hampton offers no evidence it came from any decisionmaker with influence over her employment status and it is therefore irrelevant. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 782 (7th Cir. 2007).

In sum, Hampton has not pointed to sufficient evidence that the City's non-discriminatory rationale for reassigning her was pretextual. Summary judgment is granted on Hampton's Title VII disparate-treatment claim as to her reassignment.

**2. Administrative Leave and Equipment[1]**

Hampton failed to exhaust her administrative remedies for her race-based disparate-treatment claim relating to equipment seizure. Under Title VII, plaintiffs must exhaust their administrative remedies by filing a timely charge with the EEOC or appropriate state agency. *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1099 (9th Cir. 2002). This exhaustion requirement puts the charged party on notice of the claim and "narrows the issues for prompt adjudication and decision." *Id.* (simplified). Claims, allegations, or types of discrimination *not* listed in the original EEOC charge generally remain unexhausted. *Shah v. Mt. Zion Hosp. & Med. Ctr.*, 642 F.2d 268, 271–72 (9th Cir. 1981). But allegations of types of discrimination not included in the EEOC charge may still be considered exhausted if they are "like or reasonably related to the allegations" in the charge. *B.K.B.*, 276 F.3d at 1100. Put differently, a claim for a type of discrimination may be exhausted if it could fall within the scope of "an EEOC investigation which can reasonably be expected to grow out

[1] Hampton's second EEOC charge, pleadings, and response to the City's motion for summary judgment are ambiguous as to whether she is arguing that *only* the equipment seizure was illegal, or whether she is arguing the combination of her placement on administrative leave and the equipment seizure were illegal. (*Compare* Docs. 40 at 29–30; 85 at 13 (referring only to the equipment seizure as unlawful by pointing to comparators who were also placed on administrative leave), *with* Docs. 40 at 27, 29–30; 83-2 at 2; 85 at 13, 14 (mentioning placement on administrative leave alongside discussion of equipment seizure).) The court need not resolve the issue because the reasons for granting summary judgment on Hampton's claims do not hinge on which exact actions by the City allegedly violated Title VII and the ACRA.

of the charge of discrimination." *Lyons v. England*, 307 F.3d 1092, 1104 (9th Cir. 2002). Courts construe the language of EEOC charges with "utmost liberality." *B.K.B.*, 276 F.3d at 1100.

Hampton did not exhaust a *race-based* disparate-treatment claim related to her equipment seizure because she alleged only *sex* discrimination and retaliation in the relevant EEOC charge. (Docs. 83 at 18–19; 83-2 at 2–3.) The second EEOC charge did not mention race, and any EEOC investigation into the charge would not have reasonably been expected to examine whether the equipment seizure and placement on leave were racially discriminatory (Doc. 83-2 at 2–3). *Shah*, 642 F.2d at 271–72 (Title VII claim was not exhausted where plaintiff's EEOC charge alleged different types of discrimination than his lawsuit, even though the charge and lawsuit described the same employer actions); *Holloway v. Eastbridge Workforce Solutions*, No. CV-18-00795-PHX-SMB, 2019 WL 1059969, at *7 (D. Ariz. Mar. 6, 2019) (same). Hampton's second EEOC charge listed "three male Officers" who were "treated better because they are male" and because they had not sued the City for discrimination when they were put on leave. (Doc. 83-2 at 2.) She concluded she was "discriminated against because of [her] sex (female)." (Doc. 83-2 at 3.) Even construed with the "utmost liberality," *B.K.B.*, 276 F.3d at 1100, the charge cannot be interpreted to also encompass a race-based theory of disparate treatment, and Hampton does not argue that other papers sent to the EEOC even hint at racial discrimination for seizing her equipment.[2] (*See* Doc. 85-2 at 61–66.)

Hampton argues any EEOC investigation into the charge would have encompassed race because the charge alleged retaliation for filing a prior EEOC charge and this lawsuit, both of which accused the same employer of racial discrimination. (Doc. 85 at 13.) But the existence of a separate race-based claim is not an allegation that the City racially discriminated against Hampton *when it placed her on leave and confiscated her equipment*—the main subject of the charge and any hypothetical investigation. As filed,

[2] Hampton's response reverts to arguing the City discriminated against her based on her gender. (Doc. 85 at 7, 13.) But her allegation of gender discrimination is not in the TAC (Doc. 40 at 29–30), and she may not base her claim on a theory of discrimination not pleaded. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000).

the charge did not provide sufficient notice to the City that Hampton accused it of racial discrimination for that particular action. *B.K.B.*, 276 F.3d at 1100.

Even if Hampton exhausted a race-discrimination claim involving these events, she fails to show the City took an adverse action against her. An adverse action "materially affects the compensation, terms, conditions, or privileges of employment." *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018) (internal quotation omitted). Her alleged comparators—Shipley, Hide, and Mezenghie—were also placed on leave (*see* Doc. 85 at 7, 13), so the relevant adverse action must be the seizure of her equipment. That is not an adverse action. Having been put on leave, Hampton had no use for her city equipment, so its seizure did not materially affect any aspect of her employment status. *Campbell*, 892 F.3d at 1012.

Because Hampton has not exhausted administrative remedies with respect to her Title VII disparate-treatment claim for the confiscation of her equipment and it would fail if she had, summary judgment is granted to the City on this claim.

**B. Title VII and ACRA Retaliation Claims**

The *McDonnell Douglas* framework governs retaliation claims. *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987). Under Title VII and the ACRA, Hampton must first establish a prima facie case by producing evidence that: (1) she engaged in a protected activity; (2) the City subjected her to a materially adverse action; and (3) there was a causal link between the two. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000); *Najar v. State*, 9 P.3d 1084, 1086 (Ariz. Ct. App. 2000). The City then bears the burden of articulating a legitimate, non-retaliatory reason for its action, after which Hampton must show the City's reason was mere pretext for a retaliatory motive. *McDonnell Douglas*, 411 U.S. at 804.

**1. Job Reassignment**

Similar to her Title VII disparate-treatment claim, even if Hampton could make a prima facie retaliation case for her reassignment to property disposition, she fails to produce evidence sufficient for a reasonable jury to conclude that the City's non-

discriminatory reason was pretextual. Most of her arguments repeat those discussed above (Doc. 85 at 13–14) and are rejected for the same reasons.

In the retaliation context, however, Hampton also raises McCoy's deposition statements as evidence of pretext. She highlights two statements: first, McCoy agreed in his deposition that employees had the right to file Safe Haven and EEOC complaints free from retaliation (Doc. 85 at 14 (citing Doc. 85-2 at 105–06, 110–111, 114)); and second, when asked what he did when he learned Hampton had filed a Safe Haven complaint, McCoy answered "I don't believe I did anything" (Doc. 85 at 14 (citing Doc. 85-2 at 105–06, 110–111, 114)). Hampton appears to suggest McCoy's failure to act on her complaint was retaliatory, evidenced by his acknowledgement that he took no action. But no reasonable jury could construe McCoy's acknowledged lack of action by itself as evidence of pretext.[3] McCoy's testimony establishes only that he understood he could not retaliate against Hampton—not that he had to take some affirmative action based on her complaint and purposely declined to do so because of her race. Absent any evidence of a duty to act, McCoy's lack of action on the complaint is minimally probative of retaliatory intent.

Hampton again fails to produce evidence sufficient to demonstrate pretext. The court grants summary judgment on her Title VII and ACRA retaliation claims as to her reassignment.

### 2. Administrative Leave and Equipment

Hampton's retaliation claim regarding her placement on administrative leave and equipment seizure fails for the same reason: Hampton does not offer sufficient evidence that the City's motivation was pretextual.

The City explains that it placed Hampton on leave and seized her equipment because she was under investigation for deleting taser logs. (Doc. 83 at 20.) The City argues seizing

[3] Without McCoy's inaction, Hampton's only other evidence of causation is the temporal proximity between the Safe Haven complaint and her reassignment. (Doc. 85 at 13–14.) But "an inference of causation based on temporal proximity is undermined or negated if intervening events are the reasons for the employer's adverse employment action." *Powell v. Transdev Alternative Serv. Inc.*, No. CV-23-01274-PHX-KML, 2025 WL 1663833 (D. Ariz. June 12, 2025) (simplified). That AZ POST started proceedings after Hampton filed the Safe Haven complaint and immediately before her reassignment breaks any chain of causation based on proximity. (Doc. 85 at 3.)

Hampton's equipment was necessary to limit "liability concerns." (Doc. 83 at 20.) The City's actions appear consistent with a standard policy of collecting employees' police ID card, badge, city-issued handgun and taser, and city-issued laptop when they are placed on leave. (Doc. 85-2 at 69.) Although the City also confiscated Hampton's phone, it provided a non-retaliatory reason for doing so—it needed to be examined due to the ongoing investigation against Hampton over altering digital records. (Doc. 85-2 at 69.) And regardless, the City issued Hampton another phone shortly after. (Doc. 85-2 at 69.)

Hampton does not raise any evidence disputing these policies. Instead, she argues factual disputes remain over whether officers Shipley, Hyde, and Mezenghie had their equipment confiscated when placed on leave. (*See* Doc. 85 at 7, 13.) But she never addresses the City's declarations showing neither Hyde nor Mezenghie had their equipment while on leave because the equipment was already on City premises that the officers could no longer access. (Docs. 83 at 19–20; 83-3 at 5, 7.) Hampton does directly dispute that Shipley's gun was confiscated. (Docs. 85 at 7; 83-3 at 9.) But her evidence—for all three officers, not just Shipley—consists solely of her own uncorroborated conclusions.[4] With no explanation how the declarant would know the information, these uncorroborated conclusions may be enough to sustain a prima facie case, but they fail to raise a genuine issue as to pretext. *Opara v. Yellen*, 57 F.4th 709, 726–27 (9th Cir. 2023); *Villiarmo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

Hampton also appeals to temporal proximity, pointing out that her placement on leave came only four days after she filed suit, six weeks after she complained to McCoy, and "months after the EEOC charge reached McCoy," whereas the logs were purged a full year earlier. (Doc. 85 at 14.) But reliance on recency does not directly "refute the government's proffered legitimate reasons for disciplining" Hampton. *Hashimoto v. Dalton*, 118 F.3d 671, 679–80 (9th Cir. 1997). More damaging for Hampton is that

[4] Hampton cites her EEOC charge (Doc. 85-2 at 100–01), her own letter responding to the City's position statement to that charge (Doc. 85-2 at 61, 69), and her own statements from her deposition (Doc. 85-2 at 40–42). The charge offers no additional support for her assertions. Her subsequent letter to the EEOC and her deposition only cite Mezenghie's notarized letter, which in fact shows he did not have access to his equipment. (Doc. 85-2 at 41–42, 61, 69 (referencing Doc. 83-3 at 5).)

temporal proximity in this case "cuts both ways." *Kama*, 107 F.4th at 1061 ("When there are equally likely causes of Plaintiff's termination that arise during the same period, temporal proximity does not establish that unlawful discrimination more likely than not motivated the employer.") (simplified). It is undisputed that the TPD Professional Standards Unit learned of Hampton's potential tampering with digital records and initiated an investigation a mere three days before the City placed her on leave. (Docs. 83 at 7; 85-1 at 129.) The actual investigation into that incident began almost immediately before she was placed on administrative leave. Without more, proximity by itself could not convince a reasonable jury that the City acted retaliatorily. *Id.*

The court therefore grants summary judgment on Hampton's Title VII and ACRA retaliation claim for her placement on leave and seizure of equipment.

## IV. Conclusion

Hampton's Title VII disparate-treatment claim as to her reassignment and her Title VII and ACRA retaliation claims as to her reassignment and equipment seizure all fail because the city offered non-discriminatory reasons for its actions and she failed to show a genuine dispute of material fact to whether those reasons were pretextual. Hampton's Title VII disparate-treatment claim as to her equipment seizure also fails because she did not exhaust her administrative remedies.

Accordingly,

**IT IS ORDERED** the City's motion for summary judgment (Doc. 83) is **GRANTED**. The Clerk of Court is directed to enter judgment in favor of defendant and close this case.

Dated this 26th day of October, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**